**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| ALMS RESIDENTS ASSOCIATION, | : | |
| KIMETA CARTER, JEANETTE | : | **CASE NO.:**_____ |
| COLEMAN, AARON JAMISON, and | : | |
| RENEE JONES, | : | **COMPLAINT FOR INJUNCTIVE** |
| | : | **RELIEF** |
| PLAINTIFFS, | : | |
| -vs- | : | |
| | : | |
| UNITED STATES DEPARTMENT OF | | |
| HOUSING AND URBAN | | |
| DEVELOPMENT and BEN CARSON in his | | |
| Official Capacity as Secretary of the United | | |
| States Department of Housing and Urban | | |
| Development, | | |
| | | |
| DEFENDANTS. | | |

**COMPLAINT**

**PRELIMINARY STATEMENT**

1.      Plaintiffs are current residents of the Alms Hill Apartments ("Alms").  They bring this action seeking injunctive relief because the United States Department of Housing and Urban Development ("HUD") has announced it intends to terminate the rental subsidies to their housing, and require them to move out of their homes.  If not stopped, HUD's actions will result in the displacement and loss of housing for more than 100 families, almost all of whom are African-American, and many of whom have disabilities or are elderly.

2.      The Alms receives rent subsidies from HUD pursuant to a project-based section 8 contract (project-based contract).  The project-based contract provides that HUD will subsidize the rents for residents of the Alms so that no family pays more than 30% of its income toward rent.

1

3.     For over thirty years, the Alms has provided affordable housing in the Walnut Hills neighborhood of Cincinnati, Ohio.  The area in which the Alms is located is a vibrant, inclusive community in close proximity to important amenities such as quality schools, parks, public transportation, and job centers.

4.     Plaintiff, Alms' Residents' Association, is also a party in the case of *City of Cincinnati v. PE Alms Hill Realty LLC,* No. A1500883 in the Hamilton County Court of Common Pleas.  In that case, the court appointed a Receiver to ensure that necessary repairs are made at the Alms so that it can remain affordable housing. Repairs are underway and many have already been completed.

5.     In spite of this progress and the oversight of the state court to ensure that necessary repairs are occurring, HUD has unilaterally and unlawfully decided to terminate the rental subsidies to the Alms Apartments.

6.     HUD has stated its intention to provide rental vouchers to tenants at the Alms who would be forced to move, but these vouchers do not guarantee housing for families and do not ensure that residents can remain in their current neighborhood.  Some tenants at the Alms are not eligible for rental vouchers, and others do not have the ability to find housing with a voucher or the funds to move to suitable alternative housing.

7.     HUD's actions threaten the permanent loss of this affordable housing from Cincinnati's already limited stock of affordable housing. Should HUD prevail in its efforts to eliminate the federal rent subsidies from the Alms, Plaintiffs will be displaced from their homes and will likely be forced to move to areas of greater poverty and racial segregation, and may have to leave the City of Cincinnati altogether. Some Plaintiffs and Alms Residents may even become homeless.

8.     HUD is required by law to provide notice to the tenants at various steps in the process toward its decision to terminate the Alms' project-based section 8 contract, and to allow tenants to participate in the decision of whether to terminate the subsidies. HUD failed to do this.

9.     HUD was required by law to make any decision in consultation with tenants prior to deciding to abate or terminate, and to obtain their informed consent before proceeding with the termination.  HUD refused to do so.

10.     HUD's actions are arbitrary, capricious, discriminatory and contrary to law. Plaintiffs bring this action under the Administrative Procedure Act, 5 U.S.C. Section 701, et seq., Sections 215 and 223 of the Consolidated Appropriations Act (2017), PL 115-31, 131 Stat 135, the Due Process Clause of the Constitution of the United States, and the Fair Housing Act, 42 U.S.C. 3601, et seq.

11.     Plaintiffs seek injunctive relief to stop HUD's termination of the project-based section 8 contract at the Alms, so that the Receiver in the related state court case can complete repairs at Alms, and the residents of the Alms can remain in their homes.

### JURISDICTION AND VENUE

12.     Jurisdiction is conferred on this Court by 28 U.S.C. §1331, 42 U.S.C §3613, and 5 U.S.C. 704.  Plaintiffs seek declaratory and injunctive relief against HUD pursuant to 28 U.S.C. 2201 and 2202.

13.     Venue is proper in the Southern District of Ohio, Western Division, under 28 U.S.C. §1391(b) because the events giving rise to the claims alleged herein occurred in Cincinnati, Ohio.

## PARTIES

14.     Plaintiff Alms' Residents' Association ("Residents' Association") is a democratically-elected tenant organization comprised solely of Alms residents.  It was formed in February, 2015.  The Residents' Association has as part of its mission to promote quality affordable housing for the Alms residents.  The organization is inclusive of all residents and operates in accordance with 12 U.S.C. 1715z-1b and 24 C.F.R. Part 245.

15.     Plaintiff Renee Jones resides at 2525 Victory Parkway, Apartment #206 at the Alms.  She has resided at the Alms for fourteen years. She wants to stay in her apartment.  She is an executive officer of the Residents' Association.

16.     Plaintiff Jeanette Coleman resides at 2525 Victory Parkway, Apartment #607 at the Alms.  She has resided at the Alms for twenty years, and wants to stay.  She is an executive officer in the Residents' Association.

17.     Plaintiff Kimeta Carter resides at 2525 Victory Parkway, Apartment #1103 at the Alms.  She has resided at the Alms for nine years.  Ms. Carter is a member of the Residents' Association. Ms. Carter would like to stay at the Alms.

18.     Plaintiff Aaron Jamison resides at 2525 Victory Parkway, Apartment #1003 at the Alms. He has resided at the Alms for more than thirty years. Mr. Jamison is a member of the Residents' Association. Mr. Jamison wants to stay.

19.     Defendant HUD is the federal agency charged with the administration and enforcement of all federal laws and contracts related to the operation, administration, maintenance, rehabilitation and disposition of federally assisted multi-family properties, including the Alms. 42 U.S.C. 1437f.

4

20.     Defendant Dr. Ben Carson is HUD Secretary, and is responsible for the overall administration of the HUD programs, including the HUD Multifamily housing program. Dr. Carson is sued in his official capacity only.

21.     Defendants Secretary Carson and HUD shall be referred to collectively as "HUD".

## LEGAL FRAMEWORK

### The Section 8 Program

22.     Congress created the Section 8 program in the Housing and Community Development Act of 1974 that supplemented the United States Housing Act of 1937, 42 U.S.C. §1437. The Section 8 program is a means of providing decent affordable housing to low-income families. Unlike public housing, which is owned and operated by public housing agencies, project-based section 8 housing is generally owned and operated by private owners.

23.     Through the Section 8 program, low-income tenants pay 30% of their adjusted incomes as rent and HUD provides a subsidy to pay the difference between the tenant's payment and the owner's rent. 42 U.S.C. §§1437f(c)(3), 1437a(a)(1).

24.     Section 8 assistance programs are either project-based or tenant-based. Under the project-based programs, the subsidy is providing under a contract that is typically between HUD and the building owner and the subsidy exclusively remains with the building when the tenant moves.

25.     Under the tenant-based programs (Called "Housing Choice Vouchers"), HUD provides subsidy funds to local public housing authorities that enter into contracts with private rental property owners. 42 U.S.C. §1437f(o). Eligible low-income tenants receive a voucher that is meant to enable them to request building owners to enter into contracts with the housing

authority on their behalf. The rental subsidy follows the tenant when the tenant moves to a different unit. Tenant-based programs rely on both an adequate supply of housing with rents within "payment standards" set by the housing authority and a willing body of rental property owners who agree to participate in the program, and rent to tenants within these rental payment standards.

## The Administrative Procedures Act (5 U.S.C. §§ 701–706)

26.     The Administrative Procedure Act ("APA") authorizes courts to review final agency actions and hold unlawful and set aside final agency actions, findings, and conclusions that are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). The APA also authorizes a reviewing court to compel agency action that is unlawfully withheld. 5 U.S.C. § 706(1). The APA provides a cause of action to challenge any final agency action taken pursuant to any statute where the action is made reviewable by that statute, or where there is no other adequate remedy in a court. 5 U.S.C. § 704.

## The Due Process Clause of the United States Constitution

27.     Each of the Plaintiffs has a constitutionally protected property interest in their continued tenancy at the Alms. Pursuant to the Fifth Amendment of the United States Constitution, Plaintiffs are entitled to notice and the opportunity to be heard, prior to any deprivation of such protected property interest.

## The Fair Housing Act

28.     Title VIII of the Civil Rights Act of 1968 ("The Fair Housing Act"), 42 U.S.C. §§3601 et seq., provides that it shall be unlawful "to make unavailable or deny a dwelling unit to any person because of race, color, religion, sex familial status, or national origin." 42 U.S.C.

§3604(a). HUD may not intentionally, or by the effect of its actions, engage in discrimination contrary to the Fair Housing Act.

29. HUD has a duty to administer programs and activities relating to housing and urban development in a manner affirmatively that furthers fair housing. 42 U.S.C. § 3608(e)(5)

## STATEMENT OF FACTS

### The Alms: Affordable housing in a desirable location.

30. The Alms is a 200 unit apartment building providing rental assistance and affordable housing for low-income families in Cincinnati, Ohio.

31. For more than 30 years, the Alms has been subsidized by a project-based contract through Section 8 of United States Housing Act, 42 U.S.C. 1437f. The project-based contract provides a monthly rental subsidy from HUD to the owner of the Alms known as a housing assistance payment ("HAP").

32. The Residents living at the Alms are low-income individuals, qualified to receive rent subsidies through the project-based Section 8 program, 42 U.S.C. 1437f. Through the program, each resident household pays 30% of their adjusted monthly income to the owner for their rent. HUD pays the remaining cost of the lease contract rent to the owner.

33. All utilities are paid for by the owner of the Alms, and so this housing expense in included in the rent.

### Ownership failings and a lack of HUD oversight result in a need for major repairs.

34. As an entity receiving housing assistance payments from HUD, the owner of the Alms is required to maintain the property in "decent, safe, and sanitary" condition and to comply

with applicable state and local laws relating to the physical condition of the property. See Sec. 223(a) of the Consolidated Appropriations Act (2017), PL 115-31, 131 Stat 135, at *783.

35.     In 2013, over the objections of the City of Cincinnati ("City"), the tenants and numerous community stakeholders, HUD allowed the Alms' project-based contract to transfer to PE Alms Hill Realty LLC and PF Ohio Properties, Inc. (hereafter "PF Holdings"), New York based entities with identical ownership, and no experience in the Cincinnati or Ohio housing markets.

36.     Nine other project-based section 8 properties, eight in Cincinnati, and one in Lima, Ohio were purchased by PF Holdings at the same time ("Cincinnati portfolio"). HUD allowed the sale and transfer of each property.

37.     At the time of purchase, the Alms needed repairs due to years of deferred maintenance, and lack of any capital improvements.

38.     PF Holdings had no development or preservation plan for the Alms, and made no commitment to provide funds needed for capital repairs; nor did HUD require PF Holdings to do so.

39.     The City warned HUD that the Alms would fall into a state of serious disrepair under the ownership of PF Holdings without such a plan or funding.

40.     HUD did not heed the voiced concerns of the City, tenant advocates, or other community stakeholders. It ultimately approved the transfer of the Alms' project-based contract to PF Holdings on September 20, 2013.

41.     Shortly after the sale, PF Holdings obtained two mortgages for the Cincinnati portfolio, one that included the Alms; and on March 28, 2014, HUD consented to the assignment of the project-based contract as security for this mortgage.[1]

42.     Between 2013 and 2015, HUD consented to PF Holdings' appointment of a series of management entities for the Alms and other properties in the Cincinnati portfolio.

43.     In May 2014, the City began to identify disturbing trends with PF Holdings' management of the Alms and the Cincinnati portfolio.

44.     The property manager hired by PF Holdings for the Alms had engaged in embezzlement from prior employers, was criminally prosecuted for building code violations, and had been the subject of prosecution by the City for operating a nuisance night club that was ultimately closed by court action. See *State of Ohio v. Robert Griffin*, Hamilton C.P.  No. B1401298 (July 18, 2014); See *State of Ohio v. Robert Griffin*, Hamilton M.C. No. 11CRB371 (Sept. 27, 2011); See *City of Cincinnati v. Robert Griffin*, Hamilton C.P. No. A1306965 (November 8, 2013).

45.     Through 2014 the condition of the property continued to deteriorate as PF Holdings' property management failed to provide even routine maintenance for the property.

46.     PF Holdings' property management ignored criminal activity and complaints of criminal activity from the Alms' Residents; terminated the right of the Cincinnati Police to enter the Alms to investigate criminal activity, and instructed security to not report domestic violence to the police.

---

[1] The $14,310,000 mortgage for the Alms' includes three other project-based properties – two in Cincinnati: Shelton Gardens, and Reids Valley View Manor; and one in Lima, Ohio: Lima Club Apartments. The mortgage is not HUD insured.

47.     On December 6, 2014, with the support of the Alms Residents' the City executed an administrative search warrant at the Alms that included housing, health, and fire codes inspection of the building and apartments.

48.     The City's Building, Health, and Fire Departments identified problems in individual units, as well as the common areas, and issued notice of code violations to the owner on December 16, 2014.  PF Holdings failed to timely address the conditions or safety issues.

49.     On February 17, 2015, the City filed a lawsuit, *City of Cincinnati v. PE Alms Hill Realty LLC,* No. A1500883 in Hamilton County's Court of Common Pleas, against the owner of Alms in order to get repairs made and to seek to improve the conditions at the Alms.

50.     By this time, HUD was aware of the deteriorating condition at the Alms and the serious problems with the ownership and management.

51.     The City included HUD as a party to the Complaint and stated that HUD "may have an interest in the property because of the project-based subsidy" that it provided for the Alms. Complaint, Feb. 17. 2015, ¶9, *City of Cincinnati v. PE Alms Hill Realty LLC*, Hamilton County C.P. No. A1500883.

52.     On March 15, 2015, HUD removed the case to federal court. *City of Cincinnati v. PE Alms Hill Realty LLC*, 1:15-cv-185.

53.     HUD actively chose not to be a party in the state court case. On March 31, 2015, HUD moved to dismiss the City's case against it for lack of subject matter jurisdiction, stating that sovereign immunity barred the City from joining HUD in the action. HUD stated that its presence in the case was unnecessary.

54.     The City ultimately dismissed HUD from the case, and the Court remanded the case back to state court. See Remand Order, July 21, 2015, 1:15-cv-185.

55. The Residents' Association answered the City's Complaint and filed cross-claims against the owner for its failure to make needed repairs at the property.

56. Two lenders, including the lender for the Alms mortgage, US Bank National Association as Trustee[2] ("Lender"), filed cross-claims for foreclosure against PF Holdings.

57. PF Holdings and the management continued to refuse to make the needed repairs to the Alms, and so the City and the Residents' Association filed a joint motion asking the court to appoint a receiver. Subsequently, the Lender filed a motion pursuant to the state foreclosure statute, seeking the appointment of a receiver pursuant to the terms of the mortgage and note.

58. On February 27, 2015, HUD conducted an on-site Management and Occupancy Review for the Alms. The report indicated that the management at the Alms was "below average." HUD found that maintenance recordkeeping was incomplete and that the owner did not have a detailed policy/procedure that covered the necessary actions, requirements and functions for the office and maintenance staff. It further found that maintenance work orders were not completed or not properly recorded by staff and that many work orders stated work completed within 10-15 minutes regarding work that should take much longer.

59. On April 16, 2015, HUD's Real Estate Assessment Center ("REAC") completed a physical inspection of the Alms. The property failed the inspection. The REAC rated the Alms as having one or more serious, exigent fire safety problems.

60. In July 2015, noting that Residents continued to experience retaliation from the PF Holdings' management, the Alms Residents' Association filed an administrative complaint with HUD. To date, the Residents' Association has received no response from HUD regarding this complaint.

---

[2] The full name of the Lender entity is "US Bank National Association as Trustee for the Benefit of the Holders of Comm 2014-UBS3 Mortgage Trust Commercial Mortgage Pass-Through Certificates".

61.     On December 7-10, 2015, HUD conducted another REAC inspection of the Alms. The property again failed inspection. The inspection report noted inoperable passenger elevators, missing and damaged mailboxes, missing appliances, and electrical hazards.

**The Receiver begins the arduous task of stabilizing the Alms.**

62.     On February 1, 2016, the Hamilton County Common Pleas Court ordered the appointment of a receiver, Ms. Jodi Ridings and Milhaus Management ("Receiver").  Since that time, the Alms has been in court-ordered receivership.  The Receiver provides monthly reports to the state court on the progress of repairs and capital improvements at the property. The Lender of the mortgage on the Alms has funded the Receiver to make the repairs in excess of $6 million across the portfolio and nearly $1 million on the Alms alone. The Lender has foregone any payment on the debt so that all rental income can be reinvested in the property.  To date, the Lender has approved all funding requests from the Receiver.

63.     During the course of the receivership, unexpected obstacles slowed the pace of repairs.  On August 28, 2016, after a significant rain event, a sewage back-up and major flooding required the Receiver to focus its attention on flood remediation and the repair of the Alms' boiler system, which had been submerged under feet of sewage and water.  The repairs were promptly made, but work in completing other repairs slowed.

64.     On January 28, 2017, a fire occurred that resulted in the Receiver needing to turn its attention to repairing the damage caused by the fire.  Although the cause of the fire remains undetermined, the Receiver is presently acting to upgrade the electrical system throughout the building due to a stated concern that a faulty electrical connection may have contributed to the fire.  These repairs have been completed.

65.     Despite these unanticipated set backs, significant capital improvements and long-awaited repairs have been completed at the Alms under the receivership.  The completed repairs include:

- Replacement of two passenger elevators
- Appliance replacements
- Electrical systems repair and improvements
- Boiler repair
- Roof repairs
- Sewer line repairs
- Window, door, and screen replacements
- Mailbox replacements
- Lead risk assessment
- Fire testing repairs
- Repairs to apartment interiors

**HUD capriciously decides to stop supporting efforts to stabilize the building.**

66.     On March 7, 2017, a little more than a month after the Alms fire, HUD staff visited the Alms.  The staff expressed dissatisfaction with the pace of the Receiver's work.

67.     On March 15, 2017, HUD sent the receiver a Notice of Default of the Housing Assistance Payments Contract and Required Corrective Actions for Alms Hill ("Notice of Default").  This Notice of Default was not sent to the Residents.

68.     In response to the Notice of Default, the Receiver agreed promptly to do a complete retrofit of the electrical system at the Alms, and to make other needed repairs in a more expedited fashion.

69.     Plaintiffs soon witnessed additional work crews at the property and more repairs being completed.

70.     Buoyed by the additional repairs occurring, the Plaintiffs were unaware that their housing was in jeopardy.  From the Residents' perspective, the Alms was in better condition that it had been in many years.

13

71.     Then abruptly in the summer of 2017, and with limited notice to the Receiver, HUD scheduled a REAC inspection at the Alms.

72.     On June 8, 2017, HUD completed its REAC inspection of the Alms.

73.     Later in June 2017, HUD provided PF Holdings and the Receiver with a copy of the REAC report.  The property had again failed REAC.

74.     HUD failed to provide Alms' residents with a copy of the REAC inspection report or any notice or other information about the nature of the health and safety concerns that it identified through the June 8 REAC inspection.  On June 22, 2017 counsel for the Residents' Association was forced to make a Freedom of Information Request in an attempt to obtain the documents.  Plaintiffs eventually received a copy of the inspection report after HUD attached it to a "Statement of Interest" filed in the state court case.

75.     On June 23, 2017, HUD filed the "Statement of Interest" in the state court case in support of PF Holdings' motion to "oust" the Receiver from the Alms, and stated that "[g]iven the previous history of the property, abatement is one of the possible enforcement remedies available." See "United States Department of Housing and Urban Development Statement of Interest Regarding Defendant's Motion to Oust Receiver" at page 5, June 23, 2017, Hamilton County C.P., *City of Cincinnati v. PE Alms Hill Realty LLC*, No. A1500883.

76.     The Residents, City, the Lender, and the Receiver all attempted to get HUD to set forth a plan specifying what steps HUD required to prevent abatement of the rental subsidies. HUD has repeatedly refused to engage in such discussions, other than to say that it wanted the Alms and the Cincinnati portfolio sold to a third-party purchaser, in a pre-foreclosure sale.

77.     Despite a lack of guidance from HUD on what specific repairs needed to be accomplished to prevent the abatement or ultimate termination of the project-based contract, the

Receiver took steps to ensure that repairs continued to be made. In response to the failed REAC, the Receiver committed to HUD in writing to add a new management agent for the property. The proposed management agent was one that HUD approved of, and one that has a history of stabilizing distressed project-based properties in Cincinnati.

78.     On August 2, 2017, the state court approved the Receiver's motion to add the new management agent.

79.     The Receiver has now completed all electrical items listed as concerns in the June 2017 REAC inspection report.

80.     To date, the Receiver has cleared many of the original code violations that were at the property when it began the receivership, including some of the most critical items, such as roofs, elevators and the boiler. Many of the remaining violations are already under contract for repair or are in vacant units that will be cleared as those units are renovated.

81.     The City does not believe that the remaining code violations require the displacement of Residents from the property. The City has never issued a notice to vacate the premises, and has affirmed for HUD that the Alms is safe for the Residents to continue to live there at this time.

82.     Apparently none of this progress, however, satisfied HUD in its sudden arbitrariness and apparent rush to shut down the Alms and forcibly displace the Residents.

83.     On July 31, 2017, HUD sent a "Notice of Abatement of the Housing Assistance Payment ("HAP") Contract and Required Corrective Action" to the Receiver and PF Holdings. In its Notice of Abatement, HUD stated that the Residents would be required to relocate with details to be provided separately. Upon information and belief, this was HUD's final decision.

84.    The Notice of Abatement was provided to counsel for the Residents' Association, but not directly to any Residents at the building.

## **HUD ignores the Residents.**

85.    Throughout the process, HUD has ignored those who have the most to lose by its action to terminate the project-based contract:  the Residents.  Once HUD terminates the project-based contract, the Residents will be required to either pay market rent for their units, which they cannot afford, or relocate from their homes.

86.    None of the Plaintiffs, and few, if any, of the other Residents have the financial means to pay the full market rent.

87.    HUD has said it will offer vouchers to eligible tenants to assist them in relocating.

88.    The issuance of vouchers, however, is not guaranteed for any family.  Eligibility to reside at the Alms and eligibility for a Housing Choice Voucher are not the same.  Some of the Plaintiffs and residents may not meet the requirements for a voucher and may be left with no relocation assistance or housing assistance.

89.    Even if all residents were to receive a voucher, they would face significant hardships in placing the voucher in the Hamilton County, Ohio rental market.   African-Americans and individuals with disabilities often find it very difficult to find any landlord willing to accept a voucher in Hamilton County.

90.    Most landlords participating in the voucher program require tenants to pay utilities.  Utilities are owner-paid at the Alms.  Many residents will not be able to get utilities on in their names, and will therefore be unable to locate housing.

91.    Vouchers also do not provide for the same level of tenant protections that are available at the Alms. Landlords may sell property or withdraw from the program at any time.

This may result in residents being unable to keep their vouchers for very long even if they are successfully issued.

92.     If the project-based section 8 contract at the Alms is terminated, residents face displacement from their homes and their community.  Many are also at risk of homelessness.

**HUD is discriminating against African-Americans and individuals with disabilities.**

93.     The Residents of the Alms are greater than 98% African-American. Many have a disability. The loss of housing at the Alms will have a disparate adverse effect on individuals based on race and disability.

94.     African-Americans are already in the greatest need of affordable housing in Hamilton County, Ohio. A recent study commissioned by the Local Initiative Support Corporation and produced by Xavier University's Community Building Institute found that 49% of African-American Hamilton County households pay more than 30% of their income for housing while only 29% of white families are similarly housing cost-burdened.

95.     HUD's action in terminating the project-based section 8 contract at the Alms will further exacerbate this racial disparity in Hamilton County by increasing the number of African-American families who lack affordable housing.

96.     HUD's actions will also result in reducing affordable housing options for minorities and individuals with disabilities in an area of economic opportunity and racial diversity.

97.     The Alms is located within half a block of a census block that offers a positive and unique location within Hamilton County for an affordable housing building.  As of the 2010 census data, the census block bordering the Alms had a median family income of $87,333, higher than the average median income in Cincinnati.  More than half of the residents in this census

block had a college degree. Two-thirds of the population living in the census block were white. This area's housing has only increased in demand since the 2010 census, making it increasingly difficult for anyone, regardless of income, to find units to rent.

98.     Residents provided vouchers will in all likelihood find it nearly impossible to stay in the Walnut Hills neighborhood, or even to move into a similar neighborhood, as few landlords in such neighborhoods in Hamilton County accept vouchers, and are not required by law to do so.

99.     HUD knew the importance of preserving affordable housing in this inclusive community, and understood the racial implications of its action but still chose to close the property, although other options existed that would have allowed the property to continue with its project-based section 8 contract while also being brought into decent, safe, and sanitary condition.

## CLAIMS

## COUNT 1:  ADMINISTRATIVE PROCEDURES ACT AND SECTION 215 AND 223 of THE 2017 CONSOLIDATED APPROPRIATIONS ACT

100.     Plaintiffs re-allege each of the preceding paragraphs.

101.     Plaintiffs bring this claim under the Administrative Procedure Act, 5 U.S.C. §701, et seq, and Sections 215 and 223 of the Consolidated Appropriations Act (2017), PL 115-31, 131 Stat 135.

102.     Pursuant to the Consolidated Appropriations Act of 2017, HUD "shall maintain any rental assistance payments under section 8 of the United States Housing Act of 1937." Where a project-based property is experiencing foreclosure, HUD may determine that it is not feasible to continue the rental assistance but only "in consultation with the local government and tenants."  If it is determined that a contractual abatement remedy is needed because of major

18

threats to health and safety, the relocation can occur only "after written notice to and informed consent of the affected tenants and use of other available remedies, such as partial abatement or receivership."  Section 215, Consolidated Appropriations Act (2017), PL 115-31, 131 Stat 135, at *783.

103.    HUD failed to follow any of the requirements set forth in Section 215.  It did not consult with the tenants before determining unilaterally that it was not feasible to continue rental assistance at the Alms.  It did not obtain informed consent of the affected tenants for any relocation.  And it did not make use of other available remedies prior to deciding to terminate the rental assistance payments.

104.    HUD is required to take a variety of steps short of termination of the project-based contract to obtain compliance with the contract requirements.  These steps include, but are not limited to, abating rental assistance to individual units where deficiencies are present, requiring the owner or receiver to provide a detailed corrective action plan, requiring immediate replacement of the project management, imposing monetary fines, or seeking a judicial order of specific performance requiring the owner to cure the project deficiencies. Sec. 223(c)(2), Consolidated Appropriations Act (2017), PL 115-31, 131 Stat 135, at *783.

105.    HUD did not take any of these steps listed above to obtain compliance the project-based contract but instead moved straight to the termination of the contact.

106.    HUD failed to take into account the actions that the Receiver took to address both the March 2017 Notice of Default and the June 2017 failed REAC inspection by appointing a new property management agent, making all exigent health and safety repairs, agreeing to retrofit the entire building's electrical system, and systematically working to address outstanding violations.  HUD failed to consider the knowledge of the City's housing, health, and fire

inspectors who saw no need to vacate the building, and who attested to the significant progress made by the Receiver since June 2017.

107.    HUD did not even allow the new property management agent for the Alms a month to manage the property before it unilaterally issued its notice of abatement.

108.    HUD's actions in abating, and moving to terminate, the project-based contract at the Alms were arbitrary and capricious for all of the above reasons and contrary to law in violation of the Administrative Procedures Act.

## COUNT II:  VIOLATION OF FIFTH AMENDEMENT PROCEDURAL DUE PROCESS

109.    Plaintiffs re-allege each of the preceding paragraphs.

110.    Plaintiffs have a property interest as tenants of the Alms and as participants in the HUD Multifamily housing program.

111.    HUD failed to provide Plaintiffs adequate notice and a pre-deprivation opportunity to be heard about HUD's decision to abate and terminate the project-based contact at the Alms.

112.    HUD has violated the Fifth Amendment to the United States Constitution by its action to deprive Plaintiffs of their property interest without due process of law.

## COUNT III:  VIOLATION OF FAIR HOUSING ACT, 42 U.S.C. 3601, et seq.

113.    Plaintiffs bring this claim under the Fair Housing Act, as amended, 42 U.S.C. 3601 et seq., 42 U.S.C. 2000d, and 5 U.S.C. 706.

114.    HUD's actions have the purpose and effect of discriminating against Plaintiffs on the basis of race and disability in violation of the Fair Housing Act.

115.    HUD chose not to pursue other alternatives available to it that would have had less severe adverse fair housing effects, and has failed to affirmatively further the fair housing rights of the Plaintiffs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request this Honorable Court to:

A.  Declare that Defendants have violated the Administrative Procedures Act, 5 U.S.C. 701 et seq., and Sections 215 and 223 of the Consolidated Appropriations Act by acting in an arbitrary and capricious manner and contrary to law in abating and deciding to terminate the project-based contract at the Alms;

B.  Declare that Defendants violated Plaintiffs' Fifth Amendment right to procedural due process by failing to provide notice and pre-deprivation opportunity to be heard prior to the decision to abate and terminate the project-based contract;

C.  Declare that Defendants have violated the Fair Housing Act, 42 U.S.C. 3601 et seq. by discriminating against Plaintiffs on the basis of race and disability;

D.  Issue a preliminary injunction setting aside HUD's decision, suspending HUD's abatement of the rental subsidies for the Alms, and preserving its project-based section 8 housing assistance payment contract pending a decision on the merits;

E.  Issue a permanent injunction directing the Defendants to maintain the project-based contract at the Alms;

F.  Issue a permanent injunction directing the Defendants to take alternative steps to bring the Alms into full compliance with the project-based contract;

G.  Issue a permanent injunction directing the Defendants to carry out their obligation to comply with the Fair Housing Act in regard to their decisions regarding the Alms;

H.  Award Plaintiffs costs, expenses, and reasonable attorneys' fees pursuant to 28 U.S.C.

2412 and other applicable law; and

I.   Grant all other relief to which Plaintiffs may be entitled.


Respectfully submitted,


/s/ Virginia Tallent
Virginia Tallent (0084946)
Trial Attorney for Plaintiffs
THE LEGAL AID SOCIETY OF GREATER CINCINNATI
215 E. Ninth Street, Suite 200
Cincinnati, OH  45202
Phone:  (513) 362-2835; Fax: (513) 241-0047
Email:  vtallent@lascinti.org

/s/ Stephanie Moes
Stephanie Moes (0077136)
Nicholas J. DiNardo (0069544)
Attorneys for Plaintiffs
Legal Aid Society of Southwest Ohio, LLC
215 E. Ninth Street, Suite 500
Cincinnati, OH  45202
Phone:  (513) 362-2807; Fax:  (513) 241-1187
Email:  smoes@lascinti.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 12, 2017, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system, which will send notification of such filing to the following:

- William B. King II (0094046)
  Assistant United States Attorney, Southern District of Ohio.
  U.S. Attorney's Office
  221 E. Fourth Street, Suite 400
  Cincinnati, OH 45202
  Fax: 513-684-6385
  Email: Bill.King@usdoj.gov

I further certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

- Nancy D. Christopher, the Associate General Counsel for Litigation
  Office of Litigation - Room 10258
  U.S. Department of Housing and Urban Development
  451 Seventh Street, S.W.
  Washington, D.C.  20410
  Email: Nancy.D.Christopher@hud.gov

/s/ Virginia Tallent
Virginia Tallent (0084946)
Trial Attorney for Plaintiffs