UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ALMS RESIDENTS ASSOCIATION, *et al.*,

       Plaintiffs,

vs.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN
DEVELOPMENT, *et al.*,

       Defendants.

Case No. 1:17-cv-605

Judge Timothy S. Black

## ORDER GRANTING PLAINTIFFS' MOTION
## FOR PRELIMINARY INJUNCTION (Doc. 3)

This civil case is before the Court on Plaintiffs' motion for preliminary injunction

(Doc. 3), which motion asks this Court to enjoin/halt Defendants from abating/ending a

Section 8 housing assistance contract, the parties' responsive memoranda (Docs. 6, 9,

16), the brief of the City of Cincinnati ("City") as *amicus curiae* (Doc. 12), and oral

argument held on October 6, 2017.

## I. FACTS

### A. The parties.

The Alms is a 200 unit, federally subsidized, project-based Section 8 apartment

building located in the Walnut Hills neighborhood of Cincinnati, Ohio. (Doc. 3 at 2;

Doc. 3-1 at ¶ 4). The Alms provides housing exclusively to eligible, low-income

residents, approximately 98% of whom are African American, and many of whom are

elderly and/or disabled. (*Id.*) The Alms has provided a source of affordable housing in

the Walnut Hills neighborhood for more than 30 years. (Doc. 3 at 2).

Plaintiff Alms Residents Association (the "Residents Association") is a democratically elected tenant organization comprised solely of Alms residents, formed in 2015. (Doc. 3 at 2; Doc. 3-1 at ¶ 6). The Residents Association's mission is, in part, to promote quality affordable housing for the Alms residents. (Doc. 3 at 2).

Plaintiff Kimeta Carter has lived at the Alms for <u>nine years</u> and is a member of the Residents Association. (Doc. 3-2 at ¶¶ 2-3, 5). Due to her low income, she pays $25 per month for a one bedroom apartment. (*Id.* at ¶ 2). Ms. Carter's lease at the Alms "will terminate automatically, if the Section 8 Housing Assistance contract terminates for any reason." (Doc. 18-3 at 9).

Plaintiff Jeanette Coleman has lived at the Alms for <u>twenty years</u> and is an officer in the Residents Association. (Doc. 3-3 at ¶¶ 3-4). Due to her low income, she pays $25 per month for a one bedroom apartment. (*Id.* at ¶ 2). Ms. Coleman's lease at the Alms will "terminate automatically, if the Section 8 Housing Assistance contract terminates for any reason." (Doc. 18-2 at 9).

Plaintiff Aaron Jamison has resided at the Alms for <u>more than thirty years</u> and is a member of the Residents Association. (Doc. 3-4 at ¶¶ 4-5). Based on his disability benefits, he pays $254 per month for a one bedroom apartment. (*Id.* at ¶ 2). Mr. Jamison's lease at the Alms "will terminate automatically, if the Section 8 Housing Assistance contract terminates for any reason." (Doc. 18-1 at 9).

Plaintiff Renee Jones has resided at the Alms for <u>fourteen years</u> and is the president of the Residents Association. (Doc. 3-5 at ¶¶ 3, 5). She pays $25 per month for a one bedroom apartment. (*Id.* at ¶ 2). Ms. Jones's lease at the Alms "will terminate

automatically, if the Section 8 Housing Assistance contract terminates for any reason." (Doc. 18-4 at 9).

Defendant HUD is the federal agency charged with the administration and enforcement of all federal laws and contracts related to the operation, administration, maintenance, rehabilitation, and disposition of federally assisted, project-based Section 8 properties, including the Alms. (Doc. 3 at 4). Defendant Ben Carson [M.D.] is the Secretary of HUD, and as such, is charged with the administration and enforcement of all functions, powers and duties of HUD, including those related to the disposition of multi-family properties. (*Id.*); 42 U.S.C. § 3533. Defendants are referred to collectively here as "HUD."

### B. The Section 8 housing assistance program.

The Section 8 housing assistance program was created to aid low-income families in obtaining a decent place to live and to promote economically mixed housing. 42 U.S.C. § 1437f(a). Under the housing assistance program, HUD subsidizes rent for low-income tenants by entering into contracts with property owners under which HUD pays the owner the difference between a unit's fair market monthly rent and the qualifying tenant's required contribution under the Section 8 program. 42 U.S.C. § 1437f(c); 42 U.S.C. § 1437a(a). Owners of properties with Section 8 housing assistance contracts are required to maintain the property in "decent, safe, and sanitary" condition. 42 U.S.C. § 1437f(c)(4); 24 C.F.R. § 5.703.[1]

---

[1] "Decent, safe and sanitary" is defined at 24 C.F.R. § 5.703.

HUD enforces the "decent, safe and sanitary" requirement through inspections, audits and other actions. 42 U.S.C. § 1437c(h); 24 C.F.R. §§ 200.855, 200.857. HUD's Real Estate Assessment Center ("REAC") is responsible for inspecting Section 8 housing, and it assigns a numerical score for each inspection on a 100-point scale. 24 C.F.R. §§ 5.705, 200.857. A score below 60 is failing; properties scoring under 30 are referred to the Departmental Enforcement Center. 24 C.F.R. § 200.857.

## C. The Alms is transferred to PF Holdings in 2013.

In early 2013, <u>over the objection of the City, counsel for the Residents Association, and other local stakeholders</u>, HUD allowed the purchase and transfer of the Alms and a portfolio of nine other multifamily properties in Southwest Ohio (the "Cincinnati Portfolio") from a local owner to New York based "PE Alms Realty LLC" and "PF Ohio Properties" (hereafter referred to as "PF Holdings"). (Doc. 3 at 4; Docs. 3-9, 3-10). In April 2013, Michael Cervay, the City's Director of Community Development, wrote to HUD and warned about potential disadvantages of allowing, *inter alia*, the Alms to be transferred to PF Holdings, an out-of-state entity with no intention of investing in Cincinnati neighborhoods and no plans for capital improvements nor rehabilitation. (Doc. 3 at 4-5; Doc. 3-11). Mr. Cervay's letter stated, in relevant part:

> On Tuesday, March 5, 2013, local community stakeholders participated in a meeting convened by Vice Mayor Qualls and the prospective managers of the Downtown Property Management portfolio of 748 units, Aaron Kanter and Steve Reinman. It should be noted the meeting was intended to be with the prospective purchasers, but they sent these representatives instead.
>
> It was made clear to the participants in that meeting that the new owners have no intention of investing in our neighborhoods through the purchase of this portfolio. Mr. Reinman stated that there are no plans for capital

> improvements or rehabilitation, a dialogue with the neighborhoods, nor
> their own new residents regarding what is needed to preserve these
> buildings. He further explained that they would do nothing more than
> replace the flooring in the kitchens, bathrooms and halls, estimating such
> spending at roughly $1,000 to $1,200 per unit. This amount is well below
> responsible turnover costs. The only other capital expenditures discussed
> were locks on the perimeter doors and some common areas tile work.

(Doc. 3-11 at 1).

Despite these warnings from the City, on April 30, 2013, HUD allowed the

Section 8 housing assistance contract for the Alms ("HAP Contract") to be assigned to

PF Holdings. (Docs. 3-9; 3-10).[2]

Under the HAP Contract, the owner "agrees (1) to maintain and operate the

Contract Units and related facilities so as to provide Decent, Safe, and Sanitary housing,

and (2) to provide all the services, maintenance and utilities set forth in Exhibit C. If the

Government determines that the Owner is not meeting one or more of these obligations,

the Government shall have the right, in addition to its other rights and remedies under

this Contract, to abate housing assistance payments in whole or in part." (Doc. 6-2 at

¶ 1.7(a)). The HAP Contract provides that "[i]f the Government notifies the Owner that

he (sic) has failed to maintain a dwelling unit in Decent, Safe, and Sanitary condition and

the Owner fails to take corrective action within the time prescribed in the notice, the

Government may exercise any of its rights or remedies under the Contract, including

---

[2] The contract assumed by PF Holdings consisted of the original HAP Contract signed on
October 31, 1977 (Doc. 6-2) and a five-year renewal signed on October 1, 2010. (Doc. 6 at 7).
On September 1, 2013, PF Holdings signed a renewal that extended the HAP Contract for an
additional twenty years. (Doc. 6-3). The renewal contract provides that all terms of the
preceding HAP contract are renewed except for those provisions relating to contract rents and
rent adjustments, or unless specifically modified. (Doc. 6-3 at 9).

abatement of the housing assistance payments, even if the Family continues to occupy the unit." (*Id.* at ¶ 1.7(c)). The HAP Contract allows HUD to inspect the property at such times "as may be necessary to assure that the Owner is meeting his obligations to maintain the units in decent, safe, and sanitary condition and to provide the agreed upon utilities and other services." (*Id.* at ¶ 1.7(b)(2)).

### D. The Alms falls into disrepair.

Plaintiffs allege that, between 2013 and 2016, the Alms (and related properties) were mismanaged by PF Holdings and the management agents it chose to engage, each of which were HUD approved. (Doc. 3 at 5). The property's issues were noted in multiple HUD inspections.

On April 16, 2015, HUD's REAC inspected the Alms. (Doc. 6-4 at ¶ 7). The inspection resulted in a score of 49c* out of 100.[3] (*Id.*) The inspection found a myriad of deficiencies at the property including tripping hazards, cracks and gaps in the walls, exposed electrical wires, inoperable auxiliary lighting, damaged hardware on locks and doors, and roach and insect infestation. (Doc. 6 at 8; Doc. 6-8). The inspection also identified health and safety deficiencies which required immediate attention and repair. (*Id.*)

On June 26, 2015, HUD issued a Notice of Default of the HAP Contract to PF Holdings. (Doc. 6 at 9, Doc. 6-17). The Notice required PF Holdings to survey the property and correct all deficiencies. (Doc. 6-17 at 2-3) The Notice also included a

---

[3] The "c" in the score indicates that the inspector identified one or more exigent health and safety deficiencies. The asterisk indicates health and safety deficiencies were found with respect to smoke detectors. (Doc. 6 at 8, n. 2).

notice of compliance, disposition and enforcement plan that PF Holdings was required to send to Alms tenants. (Doc. 6-4 at 7). The communication informs the tenants that the owner has been instructed by HUD to correct physical deficiencies at the Alms and asks tenants to notify HUD if they become aware of owner actions contrary to those instructions. (*Id.*)

On December 10, 2015, HUD's REAC performed a second inspection for the purpose of confirming that PF Holdings had made the necessary repairs. (Doc. 6-4 at ¶ 9; Doc. 6-9). The inspection resulted in a score of 21c* out of 100 and identified over 80 exigent health and safety deficiencies, including water leaks near electrical equipment, inoperable smoke detectors, exposed wires, and missing and damaged fire extinguishers. (*Id.*)

On December 15, 2015, HUD notified ownership that all funds allocated to the Alms from HUD were to be used for the operations and repairs at the Alms until the default was remedied. (Doc. 6-5 at ¶ 8).

HUD asserts it was then "prepared to commence enforcement action, including the potential abatement and termination of the HAP contract," but did not take any formal enforcement action because, as explained *infra*, the City filed a nuisance lawsuit. (Doc. 6 at 10; Doc. 6-4 at ¶ 9).

### E.     The City files a nuisance action in 2015.

In late 2015, the City filed a public nuisance action in the Hamilton County Court of Common Pleas ("State Court") against, *inter alia*, PF Holdings for the Alms (the "State Court Litigation"). (Doc. 3-13). The Residents Association answered the City's

amended complaint and filed cross-claims against PF Holdings for allowing nuisance conditions to continue at the Alms. (Doc. 3 at 5). On December 11, 2015, two mortgage lenders ("Lenders"), including the lender for the Alms mortgage ("U.S. Bank"), filed cross-claims for foreclosure against PF Holdings.[4] (*Id.* at 5-6).

The City named HUD as a party in its first Complaint and stated that HUD "may have an interest in the property because of the project-based subsidy" that it provided for the Alms. (Doc. 3 at 6). HUD removed the case to federal court, successfully moved to dismiss HUD for lack of jurisdiction, and the case was remanded back to State Court without HUD's involvement as a party. (*Id.*)

On November 6, 2015, the City and the Residents Association moved for the appointment of a receiver for the Alms and five other related properties due to the ongoing failure of PF Holdings to make repairs following the filing of the State Court Litigation. (Doc. 3 at 6). On December 8, 2015, the Lenders filed their own motion for the appointment of a receiver. (*Id.*). On February 1, 2016, the State Court granted these motions and appointed a receiver ("Receiver") for, *inter alia*, the Alms. (*Id.*; Doc. 3-14).

**F.    HUD becomes dissatisfied with the receivership.**

The parties disagree as to the success of the receivership. Plaintiffs claim the Lenders have adequately funded the receivership; through the end of August 2017, over $4.1 million in repairs have been made to the Cincinnati Portfolio. (Doc. 3 at 7; Doc. 3-

---

[4] The full name of the lender for the Alms' mortgage is "US Bank National Association as Trustee for the Benefit of the Holders of Comm 2014-UBS3 Mortgage Trust Commercial Mortgage Pass-Through Certificates." (Doc. 3 at 6, n. 2).

15 at 10). <u>Nearly $750,000 has been used specifically at the Alms for repairs and capital improvements, including the roof, elevators and electrical system.</u> (Doc. 3 at 7; Doc. 3-15 at 7).

HUD sees it differently. On March 7, 2017, HUD staff visited the Alms, observed fire and electrical damage, and determined that the Receiver had not made sufficient progress in remedying the default of the HAP Contract. (Doc. 6 at 11; Doc. 6-4 at ¶¶ 22, 23).

On March 15, 2017, HUD issued a second Notice of Default of the HAP Contract to PF Holdings and the Receiver. (Doc. 6-18). The Notice provided a list of actions the Receiver was required to take and states that failure to do so "will result in enforcement action, including but not limited to seeking to remove the current receivership, abating the Section 8 contract, and/or issuing civil money penalties against the Owner, Receiver, and any other responsible parties." (*Id.* at 5). HUD did not send a copy of the Notice to Alms residents and did not post the Notice at the Alms. (Doc. 3 at 7).

On May 24, 2017, PF Holdings filed a motion to "oust" the Receiver from control of the Alms and related properties. (Doc. 3 at 8). All parties to the State Court Action opposed PF Holdings' motion, and the State Court scheduled argument for August 2, 2017. (*Id.*)

On June 8, 2017, HUD completed a REAC inspection of the Alms. (Doc. 6-4 at ¶ 29; Doc. 6-10). The inspection resulted in another failing score of 20c* out of a possible 100 points. (Doc. 6-4 at ¶ 29) HUD asserts that the inspector identified

"numerous health and safety deficiencies" and confirmed that the property was not "decent, safe, or sanitary." (*Id.*).

HUD did not consult the Alms residents regarding the June 8, 2017 inspection, nor provide notice or a copy of the inspection to the Alms residents. (Doc. 3 at 8). HUD informed the Receiver and PF Holdings later in June 2017, that the Alms had failed the inspection; Plaintiffs' counsel obtained a copy of the report by filing a Freedom of Information Act request. (Doc. 3-20).

On June 23, 2017, HUD filed a "statement of interest" in the State Court Litigation supporting PF Holdings' motion to remove the Receiver. (Doc. 3 at 9; Doc. 6-16). HUD's statement of interest attached the June 8, 2017 REAC inspection report and the March 15, 2017 Notice of Default. (Doc. 6-16 at 16-84). On August 2, 2017, the State Court rejected PF Holdings' motion to fire the Receiver. (Doc. 3 at 10).

### G. HUD notifies Plaintiffs' counsel that HUD is abating the HAP Contract.

On July 31, 2017, HUD informed Plaintiffs' counsel that it had begun "abating the Housing Assistance Payments (HAP) contract of the Project due to the defaults of the Owner[.]" (Doc. 3 at 10; Doc. 3-23). The letter states, in relevant part:

> <u>HUD based its decision to abate this contract</u> on the Owners [sic] inability to address the serious physical deficiencies at the property. <u>HUD made this decision</u> after consultation with the City of Cincinnati and Legal Aid as representatives for the tenants. Unfortunately, the Owner's on-going default and inability to restore decent, safe and sanitary conditions to the property do not serve the interest of the tenants or HUD.

(Doc. 3-23 at 2) (emphasis supplied). HUD did not provide this notice to the individual Plaintiffs nor to any other Alms resident. (Doc. 3 at 10; Doc. 3-5 at ¶¶ 11-12; Doc. 3-3 at

¶¶ 13-15; Doc. 3-4 at ¶ 9; Doc. 3-2 at ¶¶ 6-7; Doc. 3-1 at ¶¶ 10-11).

On September 6 and 7, 2017, HUD's REAC performed another inspection at the Alms to confirm whether any of the claims that the property was substantially improved were true. (Doc. 6-4 at ¶ 42). During the inspection, HUD claims it found significant life threatening exigent health and safety deficiencies, and, again, the property received a score of 20c* out of 100. (*Id.*)

**H.      Tenant Protection Vouchers.**

When HUD abates and terminates a project-based Section 8 contract, tenants living at the property are given the opportunity to apply for a tenant protection voucher. (Doc. 6-4 at ¶ 49). The voucher program is administered by the local public housing authority—for the Alms, that entity is the Cincinnati Metropolitan Housing Authority ("CMHA"). (*Id.*) Vouchers provide subsidies for tenants to live in any unit, in any location, so long as the landlord accepts the voucher. (*Id.*) Once a tenant who is impacted by abatement receives a voucher, the tenant receives relocation benefits from HUD in the form of assistance from a relocation contractor who helps find a new unit that accepts vouchers, provides assistance in coordinating relocation benefits, assists the tenant with application problems, arranges for transportation to potential units, and assists in negotiation with landlords and rental applications. (*Id.* at ¶ 53). The tenant also receives financial relocation benefits to compensate for transportation costs and expenses, application fees, security deposits, moving expenses, and utility deposits or transfer fees. (*Id.* at ¶ 54).

However, <u>not everyone qualifies for vouchers</u>. (Doc. 6-4 at ¶¶ 52 and 56). <u>Further, landlords are not required to accept vouchers, and their refusal to do so constitutes a "major" barrier to the mobility of families with vouchers in Cincinnati</u>. (Doc. 3-29 at 3).

### I. Plaintiffs commence this lawsuit.

On September 12, 2017, Plaintiffs commenced this action by filing this federal Complaint (Doc. 1) and the instant motion for preliminary injunction (Doc. 3).[5] Plaintiffs' Complaint asks this Court to set aside HUD's decision to abate the HAP Contract and asserts claims under the Administrative Procedures Act ("APA"), the due process clause of the United States Constitution, and the Fair Housing Act ("FHA").

On September 20, 2017, HUD notified the CHMA that HUD had procured funds for voucher assistance for families who are affected by HUD's "decision to opt-out" of the HAP Contract. (Docs. 9-1, 9-2).

### J. HUD attempts to provide a post-hoc opportunity for Alms residents to be heard.

On September 22, 2017—ten days after the filing of this lawsuit and two days after HUD notified the CHMA that it had already decided to opt-out of the HAP Contract and had already procured funds for vouchers—HUD met with the Alms residents to hear their comments on abatement. (Doc. 6-4 at ¶ 45). HUD claims it sought comments on the termination of the HAP Contract, the cost of rehabilitating and operating the property,

---

[5] Plaintiffs' motion for preliminary injunction (Doc. 3) also included a request for a temporary restraining order that the Plaintiffs subsequently withdrew by agreed order. (*See* Doc. 5).

the availability of Federal, State, and local resources, and environmental conditions that cannot be remedied in a cost effective fashion. (*Id.*).

Forty-one Alms residents attended the meeting. (Doc. 6-4 at ¶ 46). Many residents spoke publicly to HUD at the meeting. (Doc. 9-9 at ¶ 5). The residents who spoke expressed how much the Alms has improved and how much they want to remain at the Alms. (*Id.*). Not a single resident spoke in support of the building closing. (*Id.*)

Plaintiff Carter, and other residents, asked HUD to clarify what conditions at the Alms were unsafe. (Doc. 9-9 at ¶ 6).[6] HUD refused to answer those, or any, questions, and refused to engage in any discussion. (*Id.* at ¶ 7). Instead, the HUD representatives at the meeting stated they had to speak with other people at HUD and would send a letter with responses to the residents' questions. (*Id.*) One HUD representative explained that they could not answer questions because "there are levels of administration at HUD, and I'm basically the first level." (*See* Doc. 9-6 at 17).

On September 26, 2017, HUD sent Alms residents a "notice" stating that HUD "appreciated" their participation but decided to proceed with abatement and termination of the HAP Contract. (Doc. 9-9 at 4-7).

---

[6] The Court has reviewed the transcript of the September 22, 2017 meeting (Doc. 9-6 at 2-19), and notes that multiple residents asked for clarification as to what conditions rendered the Alms unsafe and opined that items included in HUD's inspection reports were minor and not related to their safety. Several residents expressed total confusion at the fact that the Alms received higher REAC scores before the Receiver made hundreds of thousands of dollars of repairs. Residents opined that, as a result of repairs made during the receivership, the Alms is in better condition than it used to be. Multiple residents expressed fear that they would be homeless if HUD abated the HAP Contract.

**K.** **The City publicly supports maintaining the Alms as affordable, low-income housing.**

With leave of Court, the City filed a brief as *amicus curiae* in this case, arguing that the City will incur two types of harm if HUD abates the HAP Contract. (Doc. 12). First, the City argues that abatement will leave at least some current residents of the Alms without a home. (*Id.* at 3-4). The City acknowledges that HUD claims it can offer vouchers and relocation assistance, but argues some residents will not qualify for vouchers because of financial issues and/or criminal records, and those that do will have difficulty finding a landlord to accept the voucher. (*Id.*) Because there is already an acute shortage of affordable housing in the City, and abatement of the HAP Contract will increase the demand for affordable housing, the City argues that at least some of the Alms' residents will become homeless. (*Id.*) The City cites a Community Building Institute study that states there is a 40,000 unit shortage of affordable housing in Hamilton County. (Doc. 12 at 4, n. 3).

Second, the City argues that it has a vested interest in ensuring that the HAP Contract is not abated because its loss will result in the Alms becoming a vacant structure. (Doc. 12 at 5). The City argues that vacant structures invite vandalism, crime, and trespassers, all of which contribute to blight. (*Id.*) The City argues that abatement of the HAP Contract will turn the Alms into a "massive vacant structure" which will require the City to use scarce resources and taxpayer funds to provide enhanced police protection and code enforcement. (*Id.*)

14

The Court notes that the City's interest in maintaining the Alms as affordable housing for low-income residents is well-documented and has been consistent for years.

First, as explained *supra*, the City attempted to "warn" HUD about the potential dangers of allowing the Alms (and the HAP Contract) to be transferred to an out-of-state entity.  (Doc. 3-11).

Second, on April 2, 2015, the City passed Resolution No. 27-2015, which recognized that the Alms is one of the only sources of affordable housing for families with children in Walnut Hills and expressed support for tenants at the Alms in their ongoing effort to ensure that PF Holdings maintained the property in a safe and sanitary manner.  (Doc. 12-1).

Third, the City commenced the State Court Litigation in 2015 in order to "see code violations and safety issues at the PE Properties remedied and the properties to continue to provide a source of safe, decent and affordable housing for Cincinnati residents by virtue of the project-based subsidy provided by HUD."  (Doc. 3-13 at ¶ 8).

Fourth, on August 14, 2017, the City passed Resolution No. 51-2017, which states that there is already a shortage of housing in the City willing to accept a Section 8 voucher, and the proposed influx of close to 200 more families will far exceed the availability of such housing.  (Doc. 12-1 at 5).  The Resolution expresses the support of the Mayor and City Counsel for HUD delaying abatement of the HAP Contract for a period of not less than 120 days.  (*Id.* at 6).  The Resolution states that the delay will allow the Receiver to make improvements that will substantially improve the condition of the Alms.  (*Id*. at 6).

**L.    Current status of the Alms.**

At the October 6, 2017 hearing, Plaintiffs' counsel informed the Court that the State Court had recently entered an order allowing the Receiver to market the Alms for sale.  (Doc. 19 at 8:18-19).  Plaintiffs' counsel represented it was "anticipated" that the Receiver would receive a purchase agreement by the end of January 2018.  (*Id.* at 9:6-7).

All exigent health and safety items identified by HUD in both the June 8, 2017 REAC and the September 7, 2017 REAC have been remedied.  (Doc. 9-5 at ¶ 20-21). Crime at the Alms is at a five-year low.  (Doc. 3-7 at ¶ 4).  The City states that vacating the Alms is not necessary to protect the health and safety of the public, including Alms' tenants, and has communicated to HUD that the Alms does not present an immediate health or safety risk to Alms' tenants or the general public.  (Doc. 3-6 at ¶¶ 23-24).

## I.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 65(a)-(b) permits a party to seek injunctive relief when the party believes that it will suffer immediate and irreparable injury, loss, or damage. Nevertheless, an "injunction is an extraordinary remedy which should be granted only if the movant carries his burden of proving that the circumstances clearly demand it."  *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (emphasis supplied).

In determining whether to grant injunctive relief, this Court must weigh four factors:  (1) whether the moving party has shown a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others;

and (4) whether the public interest would be served by issuing the injunction. *Ne. Ohio Coal. For Homeless & Serv. Emp. Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1099 (6th Cir. 2006). These four considerations are factors to be balanced, not prerequisites that must be met. *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir. 2000).

## II. ANALYSIS

### A. Success on the merits.

#### 1. Count One: Administrative Procedures Act.

Count One of the Complaint requests the Court to set aside HUD's decision to abate the HAP Contract under the APA. The APA authorizes a person suffering a legal wrong because of agency action to seek judicial review. 5 U.S.C. § 702. A court shall "hold unlawful and set aside agency action, findings, and conclusions" found to be, *inter alia*, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; and without observance of procedure required by law. 5 U.S.C. § 706(A), (B), (D).

Plaintiffs argue that HUD's decision to abate the HAP contract is "not in accordance with law" because HUD did not comply with Congressional mandates in the 2017 Consolidated Appropriations Act.[7]

---

[7] The 2017 Consolidated Appropriations Act can be found at 115 PL 31; in the interest of brevity, it is referred to throughout this Order as the "2017 CAA."

Plaintiffs argue HUD's decision to abate the HAP Contract does not comply with Section 223 of the 2017 CAA.  Section 223 provides HUD with enforcement authority in the event a housing project with a Section 8 contract fails inspection and the owner fails to correct the deficiencies.  Section 223(b), (c).  Section 223 lists a panoply of enforcement options for HUD, including, *inter alia*, requiring immediate replacement of management, imposing monetary penalties, abatement, partial abatement, transferring the HAP contract to another project; and seeking judicial appointment of a receiver.  Section 223(c).  However, Section 223(d) states:

> (d) The Secretary shall also take appropriate steps to ensure that project-based contracts remain in effect, **subject to** the exercise of contractual **abatement** remedies to assist relocation of tenants **for major threats to health and safety** after written notice to the affected tenants.   To the extent the Secretary determines, in consultation with the tenants and the local government, that the property is not feasible for continued rental assistance payments under such section 8 or other programs, based on consideration of—
>> (1) the costs of rehabilitating and operating the property and all available Federal, State, and local resources, including rent adjustments under section 524 of the Multifamily Assisted Housing Reform and Affordability Act of 1997 ("MAHRAA"); and
>> (2) environmental conditions that cannot be remedied in a cost-effective fashion, the Secretary may contract for project-based rental assistance payments with an owner or owners of other existing housing properties, or provide other rental assistance.

2017 CAA, Section 223(d) (emphasis supplied).

Accordingly, abatement shall only be used (1) in the event of major threats to health and safety and (2) after consultation with the tenants and the local government.  *Id.*

First, <u>Plaintiffs argue that abatement is not proper under Section 223(d) because there are no major threats to health and safety. The Court agrees Plaintiffs are likely to succeed on this claim</u>. The evidence is that all exigent health and safety items identified by HUD in the two most recent REAC inspections (June 8, 2017 and September 7, 2017) have been remedied. (Doc. 9-5 at ¶¶ 20-21). The City agrees that vacating the property is not necessary to protect the safety of Alms residents. (Doc. 3-6 at ¶¶ 23-24). **<u>HUD did not identify any current "major threat to health or safety" in its briefs, at the September 22, 2017 meeting, nor at oral argument.</u>**[8]

Second, <u>Plaintiffs argue abatement is not authorized under Section 223(d) because HUD did not "consult" with the tenants. The Court agrees Plaintiffs are likely to succeed on this claim</u>. The evidence before the Court is that none of the individual Plaintiffs, nor any Alms tenants, were consulted about HUD's decision to abate the HAP Contract. (Doc. 3-2 at ¶¶ 6-7; Doc. 3-3 at ¶¶ 13-14; Doc. 3-4 at ¶ 9; Doc. 3-5 at ¶ 11-12).

HUD argues that it engaged in "extensive" consultation with the City and the Residents Association regarding the receivership in the State Court Litigation. (Doc. 6 at 28). But the evidentiary materials cited in support of this assertion merely demonstrate that HUD communicated with counsel for the Residents Association (as well as U.S. Bank and the City) about the status of the receivership and the statements of interest HUD filed in the State Court Litigation. (*Id.*; Doc. 6-4 at ¶¶ 17, 24, 30-32; Doc. 6-5 at

---

[8] **<u>At oral argument, the Court twice asked HUD's counsel what major threats to health and safety were present at the Alms</u>**. (Doc. 19 at 49:10-19, 52:4-10). **<u>HUD's attorneys did not identify any major threat to health or safety</u>**, and instead argued HUD could abate the HAP Contract if the Alms was not "decent, safe and sanitary." (*Id.*)

¶ 9).[9] Because there is no evidence that HUD consulted with Plaintiffs, nor any Alms

resident, regarding the feasibility of maintaining the HAP Contract prior to deciding to

abate it, Plaintiffs are likely to succeed on their claim that abatement is not authorized

under Section 223(d).

> b. *Section 215*.

Similarly, Plaintiffs argue that HUD's decision to abate did not comply with

Section 215 of the 2017 CAA. That section states:

> Notwithstanding any other provision of law, in fiscal year 2017, **in managing and disposing of any multifamily property that is owned or has a mortgage held by the Secretary of Housing and Urban Development,** ***and during the process of foreclosure on any property with a contract for rental assistance payments under section 8*** **of the United States Housing Act of 1937 or other Federal programs**, the Secretary shall maintain any rental assistance payments under section 8 of the United States Housing Act of 1937 and other programs that are attached to any dwelling units in the property. To the extent the Secretary determines, in consultation with the tenants and the local government, that such a multifamily property owned or held by the Secretary is not feasible for continued rental assistance payments under such section 8 or other programs, based on consideration of (1) the costs of rehabilitating and operating the property and all available Federal, State, and local resources, including rent adjustments under section 524 of the Multifamily Assisted Housing Reform and Affordability Act of 1997 ("MAHRAA") and (2) environmental conditions that cannot be remedied in a cost-effective fashion, the Secretary may, in consultation with the tenants of that property, contract for project-based rental assistance payments with an owner or owners of other existing housing properties, or provide other rental assistance. **The Secretary shall also take appropriate steps to ensure that project-based contracts remain in effect prior to foreclosure,** ***subject to*** **the exercise of contractual** ***abatement*** **remedies to assist relocation of tenants** ***for imminent major threats to health and safety*** **after written notice to and informed consent of the affected tenants and use of other available remedies, such as partial abatements or receivership**. After disposition of any multifamily property described under this section, the contract and allowable rent levels on such properties shall be subject to the requirements under section 524 of MAHRAA.

---

[9] The Court notes that HUD has not provided a feasibility analysis, and neither of its Statements of Interest indicate that HUD "consulted" with Plaintiffs nor their attorneys on the issue of the feasibility of maintaining the HAP Contract.

2017 CAA, Section 215 (emphasis added).

Accordingly, for properties in foreclosure, Section 215 provides that abatement shall only be used (1) to relocate tenants for imminent major threats to health and safety, (2) after written notice to and informed consent of the affected tenants, and (3) after the use of other available remedies, such as partial abatement or receivership. *Id.*

First, Plaintiffs argue Section 215 does not authorize abatement because there are no imminent major threats to health and safety. The Court agrees that Plaintiffs are likely to succeed on this claim. The evidence before the Court is that all exigent health and safety items identified by HUD in the two most recent REAC inspections (June 8, 2017 and September 7, 2017) have been remedied. (Doc. 9-5 at ¶¶ 19-20). The City agrees. (Doc. 3-6 at ¶¶ 23-24). Again, HUD did not identify any imminent major health or safety issues in its briefs or at oral argument.

Second, Plaintiffs argue that the tenants were not provided notice of the potential for abatement, nor did they provide informed consent. The Court agrees Plaintiffs are likely to succeed on this claim. HUD made the decision to abate the HAP Contract in July 2017. (Doc. 3-23).[10] None of the individual Plaintiffs, nor any Alms tenant, received notice directly from HUD nor the opportunity to provide comments prior to HUD's decision to abate. (Doc. 3-5 at ¶¶ 11-12; Doc. 3-3 at ¶¶ 13-15; Doc. 3-4 at ¶ 9; Doc. 3-2 at ¶¶ 6-7; Doc. 3-1 at ¶¶ 10-11). The evidence before the Court does not

---

[10] HUD's notice of abatement (Doc. 3-23) is dated July 31, 2017. At oral argument, counsel for HUD confirmed that HUD had decided by July 31, 2017 to commence abatement. (Doc. 19 at 12-13).

indice that HUD made the decision to abate the HAP Contract with "notice to and informed consent from" the Plaintiffs.

In response, HUD argues that Section 215 only applies to properties that are owned, or mortgaged, by HUD. (Doc. 6 at 24, n. 11). This argument is not well-taken. On its face, the first sentence of Section 215 makes clear that it applies to: (1) any multifamily property that is owned or has a mortgage held by HUD **and** (2) during the process of foreclosure, any property with a contract for rental assistance payments under Section 8. Accordingly, the Court finds Section 215 applies to the Alms, which is a property with a contract for rental assistance that is currently in the process of foreclosure in the State Court Litigation.

2. Count Two: Due Process.

Plaintiffs argue abatement of the HAP Contract deprives them of a Constitutionally-protected property interest in their tenancies without sufficient notice or opportunity to be heard. (Doc. 3 at 18-21). The Fifth Amendment to the United States Constitution provides that no person shall "be deprived of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V. To state a claim for violation of procedural due process, a plaintiff must establish a Constitutionally-protected property or liberty interest which was then deprived without appropriate process. *See Midkiff v. Adams C'ty Reg'l Water Dist.*, 409 F.3d 758, 762 (6th Cir. 2005).

First, Plaintiffs argue they have a Constitutionally-protected interest in their leases. (Doc. 3 at 18-19). The Court agrees. *See HUD v. Rucker*, 535 U.S. 125, 135 (stating it is "undoubtedly true" that tenants "have a property interest in their leasehold"); *see also*

*Davis v. Mansfield Metropolitan Housing Authority*, 751 F.2d 180, 184 (6th Cir. 1984) (noting that participating in a public housing program is a property interest protected by due process) (citations omitted).

HUD concedes Plaintiffs have a property interest in their leases, but argues that termination of the HAP Contract does not implicate Plaintiffs' property interests because Plaintiffs are not parties to the HAP Contract. (Doc. 6 at 31).

HUD's argument is not well-taken. Plaintiffs' leases will terminate <u>automatically</u> if HUD terminates the HAP contract. (Doc. 18-1 at 9; Doc. 18-2 at 9; Doc. 18-3 at 9; Doc. 18-4 at 9). Accordingly, HUD's abatement of the HAP Contract will deprive Plaintiffs of their Constitutionally-protected property interests in their leases. *See Roundtree v. HUD*, No. 5:09-cv-234, 2009 U.S. Dist. LEXIS 130633, at ** 17-18 (M.D. Fla. Aug. 28, 2009) (finding termination of a housing assistance contract implicated plaintiff's Constitutionally-protected property rights because "terminating the HAP Contract subsidy payments will to a certainty terminate the Plaintiffs' protected leasehold interests").

Second, Plaintiffs argue they were not afforded sufficient process prior to abatement. (Doc. 3 at 19-21). The question of what process constitutes "due" process can only be answered in relation to the circumstances of each particular case, and varies with the subject matter and requirements of each situation. *Palmer v. Columbia Gas of Ohio, Inc.*, 479 F.2d 153, 165 (6th Cir. 1973). However, due process requires, at a minimum, that parties whose rights are to be affected are given notice of the proposed action and an opportunity to be heard. *Id*. at 165-66. The notice and opportunity to be

heard must be granted "at a meaningful time and in a meaningful manner." *Id.* (citation omitted).

Here, HUD decided to abate the HAP Contract in July 2017. (Doc. 3-23). HUD did not provide Plaintiffs notice, nor an opportunity to be heard, prior to deciding to abate the HAP Contract. (Doc. 3-5 at ¶¶ 11-12; Doc. 3-3 at ¶¶ 13-15; Doc. 3-4 at ¶ 9; Doc. 3-2 at ¶¶ 6-7; Doc. 3-1 at ¶¶ 10-11). <u>The record before the Court reflects that Plaintiffs were not provided *any* process, let alone "due" process, prior to HUD deciding on a course of action that would result in the certain and immediate deprivation of Plaintiffs' Constitutionally-protected property interests</u>.

HUD argues that the September 22, 2017 meeting afforded Plaintiffs due process. (Doc. 6 at 32). This argument is not well-taken. First, this meeting occurred two months *after* HUD already decided to abate the HAP Contract and *after* Plaintiffs commenced this lawsuit. Second, <u>just two days before that meeting, HUD informed CMHA that HUD had already decided to "opt-out" of the HAP Contract</u> and had secured funds for voucher assistance. (Doc. 9-2 at 2). These circumstances <u>strongly</u> evidence that HUD's mind was already made up prior to the September 22, 2017 meeting, and that meeting constituted a *pro forma* collection of comments—by representatives who were apparently not allowed to respond—as opposed to a "meaningful opportunity to be heard."

For these reasons, <u>the Court finds Plaintiffs have demonstrated a likelihood of success on their due process claim</u>.

3.  Count Three: Fair Housing Act.

Count Three of the Complaint alleges that HUD's decision to abate the HAP

Contract violates the FHA.

Under the FHA, it is unlawful to "refuse to sell or rent . . . or otherwise make

unavailable or deny, a dwelling to any person because of race, color, religion, sex,

familial status, or national origin."  42 U.S.C. § 3604(a).  A plaintiff may establish a

violation under the FHA by showing that an otherwise neutral practice has a disparate

effect on a protected class.  *See Groach Assocs. # 33, L.P. v. Louisville/Jefferson County*

*Metro Human Rels. Comm'n*, 508 F.3d 366, 381 (6th Cir. 2007).  HUD regulations

provide:

> Liability may be established under the Fair Housing Act based on a
> practice's discriminatory effect, as defined in this section, even if the
> practice was not motivated by a discriminatory intent.  The practice may
> still be lawful if supported by a legally sufficient justification, as fined in
> paragraph (b) of this section.

24 U.S.C. § 100.500.

A practice has a "discriminatory effect" where "it actually or predictably results in

a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates

segregated housing patterns because of race, color, religion, sex, handicap, familial

status, or national origin."  24 C.F.R. § 100.500(a).  A "legally sufficient justification"

exists where the challenged practice (1) is necessary to achieve one or more substantial,

legitimate, nondiscriminatory interests of the defendant, and (2) those interests could

not be served by another practice that has a less discriminatory effect.  24 C.F.R.

§ 100.500(b)(1).  If the defendant sets forth a legally sufficient justification, the plaintiff

may still prevail upon proving that the substantial, legitimate, and nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect. 24 C.F.R. § 100.500(c)(3).

Here, Plaintiffs have presented evidence that termination of the HAP Contract will cause Plaintiffs' leases at the Alms to terminate automatically and Plaintiffs will have to find alternative housing with vouchers from HUD. (*See* Doc. 18-1 at 9; Doc. 18-2 at 9; Doc. 18-3 at 9; Doc. 18-4 at 9). Plaintiffs have presented evidence that Cincinnati has a shortage of affordable housing (Doc. 3-1 at ¶ 18; Doc. 12 at 4), and that landlords not accepting vouchers is a significant barrier to finding affordable housing in Cincinnati (Doc. 3-29 at 3), and that the affordable housing that does exist is concentrated in racially segregated areas (Doc. 3-29 at 5). Plaintiffs have set forth evidence that abating the HAP Contract will predictably reinforce or perpetuate segregated housing patterns.

However, at this stage, HUD has presented a non-discriminatory justification. HUD's notice stated that it decided to abate the HAP Contract because of serious physical defects at the Alms. (Doc. 3-23). HUD argues that maintaining the HAP Contract was not feasible because other alternatives failed: HUD was not satisfied with the State Court receivership, offers to purchase the Alms were rejected, and the parties have not been able to agree on another alternative. (*See* Doc. 16 at 3-11).

Resolution of Plaintiffs' FHA claim will most likely require a determination whether other practices could have addressed issues at the Alms without causing a discriminatory effect. 24 C.F.R. § 100.500(c)(3). On the record before it, the Court is unable to determine whether Plaintiffs are likely to succeed on this claim.

## B. Irreparable injury.

Having found that Plaintiffs are likely to succeed on their claims under the APA and the due process clause, the Court considers whether injunctive relief is required to prevent an irreparable injury. Initially, in light of the Court's conclusion that Plaintiffs have demonstrated a likelihood of success on their due-process claim, Plaintiffs are <u>not</u> required to separately demonstrate an irreparable injury. *See Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) ("when reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated.") (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

In any event, Plaintiffs have demonstrated they will be irreparably harmed if HUD abates the HAP Contract. Abatement will terminate Plaintiffs' leases and force Plaintiffs to search for another residence in a community with a 40,000-unit shortage of affordable housing. (*See* Doc. 3-1 at ¶ 18). In all scenarios, Plaintiffs will have to move. However, because landlords are not required to accept housing vouchers and there is already a shortage of affordable housing in Cincinnati, there is a realistic possibility some of the Plaintiffs will become homeless. Neither outcome can be adequately compensated by money damages. *See Smith v. State Farm Fire & Cas. Co.*, 737 F. Supp. 2d 702, 714 (E.D. Mich. 2010) (noting that the threat of eviction and "realistic prospect of homelessness" constitutes a threat of irreparable harm); *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1424 (11th Cir. 1984) (explaining the irreparable nature of having to move during the pendency of housing litigation: "a person . . . cannot remain in limbo while a court resolves the matter. He or she must find housing elsewhere, and once that

housing is found, even if in a segregated neighborhood, it becomes difficult to disrupt new friendships and other community ties by uprooting oneself again.").

<u>Though not required, Plaintiffs have shown they will suffer an irreparable injury if HUD abates the HAP Contract</u>.

## C. **Balance of harms/public interest.**

The final factor in the injunctive relief analysis is whether granting the injunction would cause harm to others and/or serve the public interest. "The irreparable injury [the plaintiffs] will suffer if their motion for injunctive relief is denied must be balanced against any harm which will be suffered by [others] as a result of the granting of injunctive relief." *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982).

First, HUD argues that a preliminary injunction will irreparably harm HUD because it will be prevented from performing its lawfully required duties; *i.e.*, "to prevent the Alms tenants from continuing to live in unsafe, unsanitary conditions in violation of Federal and State regulations." (Doc. 6 at 43).

The Court does not agree. Initially, this argument is not supported by the evidence before the Court, which is that all of the exigent health and safety items from HUD's June 2017 and September 2017 inspections have been corrected, additional repairs continue to be made through the State Court-ordered receivership, and the parties to the State Court Litigation are trying to secure a buyer, who will be subject to approval from the State Court. Each Plaintiff, and every resident who attended the September 22, 2017

meeting, want to remain at the Alms during the pendency of this case.[11]  HUD's suggests that evidence that the Alms is unsafe or unsanitary is found within the fact that five families recently moved out.  (Doc. 16 at 2).  But there is no evidence before the Court that these tenants left because of the condition of the property.  Tellingly, not one tenant, nor any former tenant, has complained about the current living conditions at the Alms, based on the record before the Court.

In any event, balancing HUD's alleged harm against the potential harm to Plaintiffs does not present the Court with a close call.  The alleged harm to HUD if an injunction is granted—continuing to provide HAP benefits to a project that HUD, but not the residents nor the City, thinks is unsafe—is trivial compared to the potential harms that await the Plaintiffs if an injunction is not granted, which harm includes losing their leases and being forced to find affordable housing in a city with an acute shortage of it.

Second, HUD argues that finding for the Plaintiffs will lower the standard of federally subsidized housing.  Specifically, HUD argues allowing Plaintiffs to remain at the Alms minimizes the standard applicable to Section 8 properties from "decent, safe, and sanitary" to merely "not yet uninhabitable."  (Doc. 6 at 44; *see also* Doc. 19 at 18-22 ("If the standard is a major threat to health and safety, owners of Section 8 housing properties across the country are going to know that they can leave their properties in such a disrepair that they don't have to spend any money.")).

---

[11] One resident said the only circumstance in which he will leave the Alms is if he is thrown out of the window.

The Court does not share this concern. The Court's decision today does not affect the Section 8 standard: HUD remains free to take any action it wishes to enforce the "decent, safe, and sanitary" standard <u>within the confines of the law</u>. But HUD cannot use the particular remedy of <u>abatement</u> without following the Congressional mandates set forth in the 2017 CAA, and HUD certainly cannot deprive Plaintiffs of their Constitutionally-protected property interests without due process.

Further, the Court finds that allowing HUD to abate the HAP Contract during the pendency of this case would be detrimental to the public interest. Specifically, it would be detrimental to the City's well-documented objective of utilizing the Alms as affordable housing for its low-income citizens. The City has devoted time and resources attempting to ensure that the Alms remains affordable low-income housing, including advocating against the initial transfer to PF Holdings and prosecuting the State Court Litigation. Allowing HUD to abate the HAP Contract at this juncture will render the City's efforts useless, increase the number of citizens who require low-income housing while decreasing the supply of low-income housing, and result in a vacant structure which will contribute to blight.[12]

### D.     No bond is required.

Pursuant to Federal Rule of Civil Procedure 65(c), the Court may issue a

---

[12] The Court finds disturbing the facts that HUD failed to heed the City's warnings regarding transferring the Alms to PF Holdings, watched as the City spent years prosecuting the State Court Litigation to fix the precise issues the City predicted, and that HUD is now attempting to abate the HAP Contract when the State Court recently allowed the Alms to be marketed for sale and the parties to the State Court Litigation believe they are just a few months away from selling the Alms to a new, State Court-approved buyer.

preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Court is required to consider the question of requiring a bond before issuing a preliminary injunction. *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978). However, the "amount of security required and whether a bond is needed is up to the discretion of the district court." *Bunn Enters. v. Ohio Operating Eng'rs. Fringe Benefit Programs*, No. 2:13-cv-357, 2013 U.S. Dist. LEXIS 86211, at * 46 (S.D. Ohio, June 19, 2013) (Marbley, J); *see also Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) ("While we recognize that the language of Rule 65(c) appears to be mandatory, and that many circuits have so interpreted it, the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security.") (emphasis supplied).

Here, neither party briefed the issue of whether a security should be required. However, HUD has not identified any costs or monetary damages that it will incur if the Court grants Plaintiffs' request for injunctive relief. HUD's alleged "damage" is that Plaintiffs will continue to live in, HUD claims, unsafe or unsanitary housing. But the evidence before the Court is that **HUD did not identify any current "major threat to health or safety" in its briefs, at the September 22, 2017 meeting, nor at oral argument**, and Plaintiffs wish to remain at the Alms. Considering the facts of this case, the Court finds that it is not appropriate to order Plaintiffs—beneficiaries of a federal housing subsidy—to post a security while the Court considers their claims and request for a final injunction on the merits.

### III.    CONCLUSION

Accordingly, Plaintiffs' motion for preliminary injunction (Doc. 3) is **GRANTED**.

Specifically, HUD is enjoined from abating the HAP Contract pending further Order of

this Court, and HUD shall continue to make rental subsidy payments to the Receiver

while the State Court Litigation is pending.  Plaintiffs need not post a bond.

**IT IS SO ORDERED**.

Date:  10/12/17

Timothy S. Black
United States District Judge